UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re

BR FESTIVALS, LLC,                                  No. 14-10175

                         Debtor(s).
_____/

BR FESTIVALS, LLC,

                         Plaintiff(s),

           v.                                                     A.P. No. 14-1044

UPTOWN THEATRE, LLC,

                         Defendant(s).
_____/

Memorandum After Trial
_____

I.  Facts

      Chapter 11 debtor in possession and plaintiff BR Festivals, LLC ("BRF"), was organized to promote a music concert lasting several days in Napa, California.  In April, 2013, while it was in the process of staging its concert, its principal diverted $500,000 of its funds in an attempt to purchase an indoor entertainment venue.  BRF got nothing in return for the funds. It lost several million dollars on its concert, resulting in its bankruptcy filing.   In this adversary proceeding, BRF seeks to recover the

1

funds from the owner of the venue, defendant Uptown Theatre, LLC ("UT"). BRF asserts that the funds are recoverable pursuant to § 544(b) of the Bankruptcy Code as a fraudulent transfer.

The transfer was perpetrated by Robert Vogt, a manager of BRF. Vogt was also a 50% owner of Willpower Entertainment, LLC ("WE"), which owned 65% of BRF. Vogt was also, through a trust, 10% owner of UT.

On February 20, 2013, Vogt presented the manager of UT, George Altamura, with an offer from BRF to purchase the Uptown Theater for $8 million. Vogt did not have experience in staging large concerts and was seriously overestimating how well BRF's concert would do.

Altamura did not accept the $8 million offer, but did agree to sell for $12 million. On April 8, 2013, Altamura presented Vogt with a written contract whereby UT would sell the theater to BRF provided that it paid $100,000 immediately and another $400,000 within 15 days for an "option" to purchase the theater for a total of $12 million, $4 million in cash and the balance by a note, to be paid by April 30, 2014. If the escrow closed by that date, the initial $500,000 would be credited toward the purchase price. However, if the escrow did not close by then the $500,000 would be forfeited. The buyer of the theater on the written contract was changed from BRF to WE at Vogt's request on the day of signing.

The contract was designed to result in forfeiture of the initial $500,000 payment. It gave the buyer only a few days to complete the purchase.[1] It contained a provision that "IF THE SALE OF ASSETS TO BUYER IS NOT CONSUMMATED AS A RESULT OF BUYER'S DEFAULT UNDER THIS AGREEMENT, SELLER SHALL BE ENTITLED TO RETAIN THE OPTION PAYMENTS AS CONSIDERATION FOR THE OPTION PURCHASE PRICE AS WELL AS SELLER'S LIQUIDATED DAMAGES FOR BUYER'S DEFAULT." There was no contingency permitting the buyer to withdraw if it could not arrange financing. There were no other parties interested in

---

[1]The contract's nominal date was March 20, 2013, giving Vogt 40 days to consummate the purchase. However, the contract was actually entered into on April 8, 2013, leaving only 22 days to consummate.

2

purchasing the theater at that time, nor was the theater listed for sale. The purchase price was exactly what Altamura believed the theater to be worth, so UT bore no risk of economic loss if Vogt somehow was able to raise the full purchase price.

On April 10, 2013, Vogt gave UT a check for $100,000 drawn on WE's bank account and marked "option payment." The check bounced.

On April 8, 2013, Vogt transferred $100,000 from BRF's bank account to WE's bank account. On April 15, 2013, Vogt transferred $400,000 from BRF's bank account to another bank account of WE. These transfers were in violation of BRF's operating agreement, which required the signature of another member on transfers of more than $10,000. On April 16, WE gave UT a cashier's check for $500,000, all of which came from BRF.

Vogt never consummated the purchase. UT gave WE a brief extension to June 15, 2013, but in the end there was no sale and UT happily kept the $500,000.

II. Fraudulent Transfer

At the time Vogt transferred BRF's funds to WE, BRF had a fair amount of cash from pre-event sales but was nonetheless insolvent by any measure. Its debts far exceeded its assets and there was no realistic way BRF could pay its outstanding obligations from its anticipated revenue. Its managers felt that BRF would fall a few hundred thousand dollars short, but even this estimate was wildly optimistic. BRF was unable to pay about $4 million in concert expenses, resulting in its bankruptcy.

Pursuant to California Civil Code § 3439.04(b), a transfer is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer, if the debtor made the transfer without receiving equivalent value and either was engaged in a business for which the remaining assets were unreasonably small in relation to the business or believed or reasonably should have believed it would incur debts beyond its ability to pay as they became due. From the facts recited above, the court has no difficulty finding the transfers of $500,000 in cash from BRF to WE on April 8 and April 15, 2013,

3

were fraudulent as to BRF's creditors. BRF got absolutely nothing as a result of the transferred funds. BRF did not have sufficient remaining assets to pay its concert creditors, and its managers knew it. Because the transfer was fraudulent as to BRF's unsecured creditors, it is avoidable by BRF as a debtor in possession pursuant to § 544(b) and § 1107(a) of the Bankruptcy Code.

III. Defenses

Having established a fraudulent transfer, the issue becomes from whom the transfer can be recovered. The transferred funds went to UT via WE, so UT is the immediate transferee of WE. This makes UT liable for recovery of the funds pursuant to § 550(a)(2) unless UT can show, pursuant to § 550(b)(1), that it took the transfer for value, in good faith, and without knowledge of its voidability. The burden is on UT to show all three in order to avoid liability. *In re Agricultural Research*, 916, F.2d 528, 535 (9th Cir. 1990); *In re AVI, Inc.*, 389 B.R. 721, 735 (9th Cir. BAP 2008); *In re Nieves*, 648 F.3d 232, 242 (4th Cir. 2011). UT has not met this burden as to even one.

A. Good Faith

UT has not convinced the court that it acted in good faith in relation to the transaction, which was clearly styled in such as way as to maximize the justification for forfeiture and windfall. After listening to all of UT's evidence, the court is not convinced that Vogt did not enter into the agreement for the sole purpose of preserving some of BRF's cash for himself notwithstanding the inevitable failure of BRF. The court is also not convinced that Altamura was not party to this in at least some degree. He is a very sharp businessman, knew the $500,000 was coming from BRF, and must have at least suspected that BRF was going to fail financially. Additionally, UT was not actively marketing the theater. It was never listed for sale, and Altamura emphatically stressed that it is not for sale. There was no evidence that Altamura was either surprised or disappointed that Vogt failed to complete the purchase. UT has accordingly not met its burden of showing good faith.

B. Knowledge

Even if UT did not act in concert with Vogt to divert money away from a failing enterprise, it

4

had far too much knowledge of the circumstances for it to meet the third requirement of § 550(b). UT knew that the $500,000 "option payment" was coming from BRF funds; in the original version of the contract BRF was identified as the buyer. Vogt, a manager of BRF, was, through a trust, one of the three owners of UT. UT knew that Vogt was having financial difficulties, as he had been unable to meet several capital calls of UT. Vogt's check for the first $100,000, drawn on a WE account, bounced.[2] All of these factors would lead a reasonable person to believe that the property transferred was recoverable, or at least put UT on inquiry notice of BRF's possible insolvency. *In re AVI, Inc.*, 389 B.R. 721, 736 (9th Cir. BAP 2008); *In re Richmond Produce Co., Inc.,* 195 B.R. 455, 464 (N.D.Cal. 1996); 5 **Collier on Bankruptcy** (16th Ed.), ¶ 550.03[2] and [3]. Moreover, the burden is on UT to show it did not have the requisite knowledge. It totally failed to meet this burden.

C. Value

Since UT did not meet its burden to show that it acted in good faith and without knowledge of the voidability of the transfer, it does not matter whether UT gave value for the $500,000. Under at least one test, however, UT did not give value.

The leading bankruptcy authority takes the position that "value" under § 550(b)(1) is merely consideration sufficient to support a simple contract. 5 **Collier on Bankruptcy** (16th Ed.), ¶ 550.03[1], p. 550-20. By this measure, UT gave value. However, no appellate courts appear to have addressed what Congress meant by "value." BRF relies heavily on Judge Ryan's opinion in *In re Laguna Beach Motors, Inc.,* 159 B.R. 562, 566-68 (Bkrtcy.C.D.Cal. 1993), which held that while the secondary transferee need not show fair market value, it must show "reasonably equivalent value" in order to establish the defense. Under Judge Ryan's view of the law, the fair market value of the property is important but not dispositive; the court must consider whether the transaction was arm's length and what the transferee gave up in exchange for the transfers.

Applying Judge Ryan's test, UT has not established "value" pursuant to § 550(b)(1). First of

---

[2] Yes, Vogt had an explanation. The fact remains, the check bounced.

5

all, the agreement was not at arm's length; Vogt was an insider of both the buyer and the seller. Second, UT gave up nothing of value. The "option" price was the right to purchase the theater for its fair market value, or very slightly more than its fair market value; UT departed with nothing. More importantly, there were no competing buyers and the property was not listed for sale, so UT did not give up the opportunity to sell the theater to another buyer during the few days it gave Vogt the chance to exercise the "option."

Since the court finds that UT did not meet its burden to show good faith or lack of knowledge, it need not decide if Collier or *Laguna Beach* properly states the law. The court merely comments that in its view Collier is more textually correct and *Laguna Beach* is wiser.

IV. Conclusion

The transfer of the $500,000 to UT was clearly fraudulent as to BRF's creditors and may be recovered from UT unless UT can establish all three elements of a defense under § 550(b)(1) of the Bankruptcy Code. Since UT did not prove a single element, it has no defense and is liable for return of the $500,000. To hold otherwise would countenance a forfeiture and a windfall at the expense of BRF's creditors.

Accordingly, judgment shall be entered in favor of BRF and against UT in the amount of $500,000, together with interest as provided by California law from and after April 16, 2013.

This memorandum constitutes the court's findings and conclusions pursuant to FRCP 52(a) and FRBP 7052. Counsel for BRF shall submit an appropriate form of judgment forthwith.

Dated: December 1, 2014

Alan Jaroslovsky
Chief Bankruptcy Judge